## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**The Dow Chemical Company on behalf of itself
and its subsidiaries and affiliates,**

            **Case No. 1:19-cv-03516**

   **Plaintiff,**

  **v.**

**Union Pacific Railroad Company, BNSF
Railway Company, and Norfolk Southern
Railway Company,**

    **Defendants.**

---

  Plaintiff The Dow Chemical Company ("Dow") on behalf of itself and its subsidiaries and affiliates brings this action for damages under the antitrust laws of the United States against Union Pacific Railroad Company ("UP"), BNSF Railway Company ("BNSF"), and Norfolk Southern Railway Company ("NS," and together with UP, BNSF, "Defendants"), and alleges as follows:

### NATURE OF THE ACTION

  1. This case centers on an agreement involving the country's major Class I railroads to uniformly increase the price of rail freight services on unregulated rail freight transportation traffic in the United States in violation of Sections 1 and 3 of the Sherman Act. Defendants implemented this conspiracy by first agreeing to break from past industry practice and create a new rate adjustment index to apply to base freight rates that excluded the cost of fuel. Defendants also agreed to charge a stand-alone fuel surcharge and calculated that additional artificially inflated cost by adopting the same or virtually the same methodologies ("Inflated Fuel Surcharges"). The Inflated Fuel Surcharges resulting from Defendants' conspiracy had no correlation to the actual cost of fuel but were purposely aimed at generating

additional cartel profits by raising the total price for rail freight services.  The railroad cartel implemented the conspiracy across the board, with virtually no exceptions.  Dow, which is among the largest rail shippers in the country, brings this action to recover the hundreds of millions of dollars it has overpaid to Defendants for rail freight services since July 1, 2003.

2.    Beginning in the Spring of 2003, Defendants UP, BNSF, NS, and co-conspirator CSX Transportation, Inc. ("CSX"), which together control approximately 90% of the rail freight traffic in the United States, participated in an astonishing series of in-person meetings, phone calls, and email communications with one another to establish and implement a new rate adjustment index and a new fuel surcharge program to be applied across every sector of their business, including carload traffic.  These initiatives were not merely an adjustment to Defendants' billing practices, but a conspiracy to artificially raise the prices for rail freight services in the United States.

3.    Defendants and their co-conspirators (including but not limited to CSX, Kansas City Southern Railway ("KCS"), Canadian National Railway ("CN"), and Canadian Pacific Railway ("CP")) orchestrated this scheme by applying the Inflated Fuel Surcharges as a percentage of a base rate that already included a fuel charge for freight transport.  This new method of calculation was a dramatic departure from past industry practice, and it would not have been possible without Defendants and their co-conspirators' coordination and concerted efforts to generate cartel profits.

4.    The Inflated Fuel Surcharges were imposed on top of significant increases in Defendants' base rates for freight transportation services.  Since 2001, Defendants have increased their base rate to recover the increased cost of expenses but have refused to provide any information demonstrating that any increase in fuel costs have been broken out from or removed from the base rate.

5.   Before the conspiracy in 2003, the majority of rail freight transportation agreements included rate adjustment provisions that weighed a variety of cost factors, including fuel, based on the Rail Cost Adjustment Factor ("RCAF") indexes and/or the All Inclusive Index ("AII"). While the RCAF was published by the Surface Transportation Board ("STB")—the federal agency vested with authority over rate-regulated freight traffic—the AII was published by the Association of American Railroads ("AAR"), a railroad trade organization for which the Defendants' respective CEOs served as board members at that time (and which continues to have each Defendant, CSX, CN, and CP as members today).  Both indexes made it difficult for Defendants and their co-conspirators to impose a standalone Inflated Fuel Surcharge because fuel costs—and any *bona fide* price increases related thereto—were already incorporated into the indexes' calculation of rate adjustments for rail freight services.  The application of an additional fuel surcharge as a percentage to the base rate would have obviously resulted in a double recovery for fuel costs.

6.   As a result, Defendants and their co-conspirators sought to eliminate the fuel component in the rate adjustment indexes and, in the Fall of 2003, they successfully conspired to cause the AAR to develop a new index called the All Inclusive Index Less Fuel ("AIILF"), which removed the fuel component.  Adopting the AIILF as their base rate adjustment index allowed all Class I railroads to apply a new, separate, and artificially high fuel surcharge as a percentage of the base rate broadly to their customers, including Dow.

7.   BNSF and UP (together, the "Western Railroads") were the first to implement the price fixing scheme, applying the same fuel surcharge formula and coordinating their rail fuel surcharges as early as July 2003.  Following the AAR's announcement of the establishment of the AIILF in December 2003 (the first success of Defendants' cartel agreement), CSX and NS

3

(together, the "Eastern Railroads") conspired to begin setting identical fuel surcharge rates to one another in March 2004.

8.  All three Defendants and co-conspirator CSX calculated fuel surcharges using a price index and charging a percentage for every incremental increase in price over the threshold amount set by the index.  Specifically, on carload traffic, the Western Railroads applied identical fuel surcharge formulas based on the U.S. Department of Energy On-Highway Diesel Fuel Price ("HDF") Index: 0.5% for every five cents that the U.S. average price of diesel fuel as measured by the HDF Index exceeded $1.35 per gallon.  The Eastern Railroads utilized identical fuel surcharge formulas based on the West Texas Intermediate ("WTI") Index: 0.4% for every $1 that the monthly average WTI price exceeded $23 per barrel of crude oil.  With the same price indexes and formulas, the two Western Railroads reached identical fuel surcharge rates as one another on carload traffic every month for years.  The two Eastern Railroads likewise reached identical fuel surcharge rates as one another every month for years.

9.  The application of the Inflated Fuel Surcharges to the base rate inflated the actual total price for each customer whose contracts were subject to Defendants' formulas, and thereby created cartel profit centers for Defendants.  In 10-K filings with the Securities and Exchange Commission, each Defendant reported substantial increases in revenue attributable to its fuel surcharge program year after year after the conspiracy began.  For example, UP reported $112 million from fuel surcharge revenue in 2003 and approximately $2.3 billion in 2008 (more than 20 times the 2003 amount).  NS reported in 2006 that its 2005 revenues increased by $1.2 billion in 2005, and that approximately one-third of that increase was attributable to higher Inflated Fuel Surcharges.

10.  In order to maintain and enforce their conspiracy, Defendants took various other collective actions contrary to past industry practice, such as publicly publishing their monthly fuel surcharge rates, refusing to negotiate discounts or waivers with customers, and resisting long-term contracts.  Dow found Defendants' fuel surcharge program to be either "their way or no way."  Dow repeatedly tried to get the Defendants to remove the Inflated Fuel Surcharges from its contracts or to negotiate a reasonable and competitive rate reflecting actual fuel costs, but Defendants uniformly insisted upon rates reflecting the Inflated Fuel Surcharges.  Dow was thus left with little choice but to accept Defendants' Inflated Fuel Surcharges.

11. In 2007, the STB issued a decision in Ex Parte Action No. 661 concerning Defendants' practice of calculating fuel surcharges as a percentage of a base rate, finding such practice as applied to regulated traffic "unreasonable."  Following the decision, Defendants switched over to mileage-based fuel surcharges on all of their regulated traffic (with the exception of NS, who decided to impose no fuel surcharges on its regulated traffic), and made plans to switch over to mileage-based fuel surcharges on their unregulated traffic as well.  However, this did not mean that Defendants had withdrawn from the cartel.  Rather, Defendants' mileage-based programs still did not reflect the actual cost of fuel paid by Defendants and were still applied on top of adjusted base rates that already included a fuel component.  Defendants have also continued to use indices that exclude fuel costs to escalate the base rate in contracts.

12. Dow has been, and continues to be, injured by Defendants and their co-conspirators' unlawful activities as further detailed herein.  In the absence of the price fixing conspiracy, Dow would not have overpaid for fuel costs and freight rates on its rail freight shipments with Defendants and other conspiring railroads during the relevant time period.  Accordingly, Dow is

entitled to damages under federal antitrust laws equal to the amount it overpaid Defendants and their co-conspirators as a result of the conspiracy.

## PARTIES

13. Plaintiff Dow Chemical Company is a Delaware corporation headquartered in Midland, Michigan.  Dow is a materials science company with one of the broadest technology sets in the industry.  Dow's portfolio of performance materials, industrial intermediates and plastics businesses delivers a broad range of differentiated science-based products and solutions for its customers in high-growth segments, such as packaging, infrastructure and consumer care.  Dow operates 113 manufacturing sites in 31 countries and employs approximately 37,000 people. Dow delivered pro forma sales of approximately $50 billion in 2018.  During the period 2003 to 2008, Dow's net sales totaled nearly $280 billion.  In April 2009, Dow acquired Rohm and Haas. During the period 2003 to 2008, Rohm and Haas's net sales totaled nearly $50 billion.

14. Dow is a substantial consumer of rail freight services within the United States, transporting many of its products and their inputs via the Defendant rail carriers.  During the relevant period, Dow consistently sought to negotiate competitive freight rates for rail shipments with Defendants and other railroads.  To do so, Dow often benchmarked the total prices it was quoted, including Inflated Fuel Surcharges, against those of the broader market for rail freight, and compared the rates across various rail freight providers.  The anticompetitive agreement between Defendants and their co-conspirators caused the prices that Dow paid to be inflated above competitive levels.  As a result of the inflated rates caused by Defendants' anticompetitive agreement, Dow was injured in its business and property.

15. Dow brings these claims on behalf of itself, its wholly-owned subsidiaries, and under assignments of antitrust claims received from its other subsidiaries and affiliates.  The

subsidiaries and affiliates of Dow that paid for rail freight services performed in the United States and which carried Defendants' inflated fuel surcharges are: Dow Chemical Canada ULC, Dow Corning Corporation, Dow Europe GmbH, Dow International Mexicana SA de CV, Dow Quimica Mexicana S.A. de C.V., Dow Reichhold Specialty Latex LLC, Hampshire Chemical Corporation, Rohm and Haas Company, Rohm and Haas Canada LP, Rohm and Haas Chemicals LLC, Rohm and Haas Mexico S. de R.L. de C.V., and Rohm and Haas Texas Incorporated.  The assignees of claims to The Dow Chemical Company for purchases of rail freight services performed in the United States and which carried Defendants' inflated fuel surcharges are:  Dow Agrosciences, LLC and Dow Agrosciences Canada Inc.

16. Defendant Norfolk Southern Railway Company has its principal place of business at Three Commercial Place, Norfolk, Virginia 23510.  NS is a major freight railroad operating primarily in the eastern United States.  NS serves all major eastern ports and connects with rail partners in the West, linking customers to markets around the world.  NS has railway lines throughout the eastern United States, including rail lines within this District.

17. Defendant BNSF Railway Company has its principal place of business at 2650 Lou Menk Drive, Fort Worth, Texas 76131.  BNSF is a wholly owned subsidiary of Burlington Northern Santa Fe Corporation, the holding company formed by the September 22, 1995 merger of Burlington Northern and Santa Fe Corporation.  BNSF is the second largest railroad network in North America and operates 32,000 route miles of railroad.  BNSF has offices and rail lines throughout the western United States, extending into the Southeastern states.  BNSF coordinates with other rail carriers to handle freight to and from other parts of the country.

18. Defendant Union Pacific Railroad Company has its principal place of business at 1400 Douglas Street, Omaha, Nebraska 68179.  UP is the largest freight railroad in the United States.

UP serves primarily the western two-thirds of the United States and maintains coordinated schedules with other rail carriers to handle freight to and from other parts of the country.

19. Other unnamed major Class I[1] railroads which also adopted Defendants' fuel surcharge formulas and applied Inflated Fuel Surcharges on unregulated private rail freight transportation traffic after July 2003 including, but not limited to, CSX, KCS, CN, and CP, or their predecessors[2] are participants as co-conspirators in Defendants' anticompetitive actions.  These other major Class I railroads have taken actions in furtherance of the cartel's agreement and thereby conspired with Defendants to artificially raise rail freight prices and generate cartel profits.  Defendants are jointly and severally liable for anticompetitive actions taken by their non-Defendant co-conspirators.

## JURISDICTION AND VENUE

20. This action is brought under Section 4 of the Clayton Act, 15 U.S.C. § 15, to recover treble damages and reasonable attorneys' fees and costs for the injuries sustained by Dow by reasons of Defendants' violations of Sections 1 and 3 of the Sherman Act, 15 U.S.C. §§ 1, 3.

21. This Court has original jurisdiction over the subject matter pursuant to 15 U.S.C. § 15 and 28 U.S.C. §§ 1331 and 1337.

22. Venue is proper in this judicial District pursuant to 15 U.S.C. § 15(a) and 22 and 28 U.S.C. § 1391, because during the relevant period a substantial part of the events giving rise to Dow's claims occurred and a substantial portion of the affected interstate trade and commerce

---

[1] Class I railroad are those with revenues in excess of $250 million in 1991 dollars, or $463.8 million in 2017 dollars.  *See* STB Ex Parte No. 748, ID No. 46493 (June 14, 2018), *available at* https://www.stb.gov/decisions/ReadingRoom.nsf/51d7c65c6f78e79385256541007f0580/0b6202d2a4e94571852582aa0042c00d?OpenDocument.  In the past decade, the following have been considered Class I railroads operating in the United States: (1) BNSF; (2) UP; (3) CSX; (4) NS; (5) Kansas City Southern Railway Company; (6) Soo Line Railroad Co. (owned by Canadian Pacific Railway); and (7) Grand Trunk Corporation (owned by the Canadian National Railway).
[2] CSX, KCS, CN, and CP were also AAR members when the conspiracy began and implemented Inflated Fuel Surcharges in accordance with the anticompetitive agreement described herein.

described below, has been carried out in this District.  In addition, one or more of the Defendants

resided, transacted business, were found, or had agents in this District.

23. This Court has personal jurisdiction over each Defendant because, inter alia, each: (a)

transacted business in this District; (b) directly or indirectly sold and delivered rail transportation

services in this District; (c) has substantial aggregate contacts with this District; and (d) engaged

in an illegal price-fixing conspiracy that was directed at, and had the intended effect of causing

injury to, Dow who was also doing business in this District.

## INTERSTATE TRADE AND COMMERCE

24. Since July 1, 2003, Defendants and co-conspirator CSX have accounted for over 90

percent of all rail shipments within the United States.  In 2006 alone, total railroad operating

revenue of Class I railroads exceeded $52 billion and by 2008 it exceeded $61 billion.  Current

total Class I railroad operating revenues exceed $76 billion.

25. Defendants and their co-conspirators' activities substantially affected interstate

commerce.  Defendants and their co-conspirators used the instrumentalities of interstate

commerce to sell and market rail freight transportation services, and they conducted rail

shipments in the flow of interstate commerce to shippers and customers throughout the United

States.

26. Defendants and their co-conspirators' unlawful activities had a direct, substantial, and

reasonably foreseeable effect on interstate commerce.

## DEREGULATION OF THE RAILROAD INDUSTRY

27. Prior to 1980, the federal government regulated virtually every facet of railroad

operation.  Railroads filed tariff rates with the Interstate Commerce Commission ("ICC"), and in

conjunction, they were able to ask the ICC for industry-wide rate increases, which could then be imposed collectively nationwide in a lawful manner.

28. The Staggers Rail Act of 1980 ("Staggers Act") substantially deregulated the railroad industry, allowing the railroads the ability to contractually establish the rates for their services without regulatory review.  Although the Staggers Act was intended to decrease rates by increasing competition, it had the opposite effect.

29. After deregulation, the railroad industry became significantly concentrated.  The number of Class I railroads greatly decreased, from thirty-five in 1980 to only seven today (two of which are owned by Canadian companies).

30. As a result, the railroad industry is under the control of only a handful of companies.  Just three Defendants, BNSF, UP, NS, and their co-conspirator CSX, account for more than 90 percent of all railroad traffic in the United States.  In 2006 alone, these four railroads accounted for nearly $50 billion of the $52 billion in total revenue for the railroad industry.  In addition, competition from smaller carriers has been negligible due to the railroad industry's high fixed costs and significant barriers to entry, such as the need to invest in tracks, stations, yards, and switching facilities that take decades to develop.

31. Now, more than 80 percent of rail shipments are not rate regulated and instead are either set by private transportation contracts or exempt from regulation.  Virtually all of Dow's rail freight shipments are made according to privately negotiated rail freight contracts.  Whereas, prior to deregulation, railroads could collectively agree to ask a federal agency to obtain uniform increases in freight rates, they can no longer do so.  Instead, to increase the rates they charge customers, the railroads have unlawfully colluded with one another.

**DEFENDANTS COLLUDED TO INCREASE RATES BY CREATING A NEW BASE RATE ADJUSTMENT INDEX WITHOUT A FUEL COMPONENT AND INTRODUCING STANDALONE "FUEL SURCHARGES"**

32. As a result of the consolidation of the rail industry, in March 2000, the STB (the ICC's successor) imposed a moratorium on new major mergers in the rail industry.  Further, in June 2001, it announced stricter standards for mergers of large carriers.

33. The STB's actions meant that it would be very difficult for the railroads to consolidate through mergers and thereby reduce competition to increase market share and prices, and after deregulation, the railroads could no longer agree to ask the ICC for industry-wide rate increases. Defendants now lacked the lawful and potent mechanisms to increase their rates and so, notwithstanding the increased concentration in the rail industry, rail freight prices hastily declined.  Rates decreased to all-time lows in 2003 and 2004, just before the conspiracy started.

34. Defendants and their co-conspirators became eager to reverse this downward pricing trend.  Defendants therefore colluded to increase their rates by imposing uniform Inflated Fuel Surcharges on their customers, claiming that the increases were due to rising fuel costs.  But rather than track the supposed fuel cost increases, the Inflated Fuel Surcharges were calculated as a percentage of the total freight price.

35. This method of calculation for the fuel component of a rail freight contract was rarely used in the industry.  Before the conspiracy began, most of Defendants' rail freight contracts included rate adjustment provisions tied to the AII and RCAF indexes.  These indexes weighed several costs, such as labor, materials, equipment rent, depreciation, interest, other expenses, as well as fuel.  Accordingly, these indexes would reflect the impact of a cost increase of any one factor.  If fuel costs rose, the indexes would account for that increase, and any fuel charge increase would be reflected in Defendants' rates.

36. Indeed, the overall concept of uniform and price-based standalone rail "fuel surcharges" was also new for Defendants.  Prior to 2003, Dow either did not pay or paid a *de minimis* amount of standalone fuel surcharges to the Defendant railroads.  In the years leading up to 2003, Defendants had imposed some "fuel surcharges" on their rail customers but only in isolated instances.  These surcharges varied because they reflected, among other things, differing fuel costs for each railroad.

37. In addition, before the conspiracy began, Defendants generally had difficulty imposing fuel surcharges on their customers.  For example, a BNSF internal 2002 report stated that "[t]he trucking industry uses fuel surcharges but our rail competitors do not and we therefore are hard pressed to achieve it. We do loose [*sic*] business because of that and we may have to lower margin in other aspects in order to keep the business with the surcharges where we do apply it." A January 2003 BNSF memorandum further noted that "any increase in fuel surcharges would result in a decrease in prices of the same amount in order to remain competitive."  The then-manager of NS's pricing systems stated that fuel surcharges were only "theoretically billable" in 2001 and 2002, while UP's chief financial officer has acknowledged that, between 2000 and 2002, UP had "no policy position" on fuel surcharges beyond certain "isolated situations where there were surcharges."

38. Unable to increase rail freight rates in the wake of deregulation and the STB's restrictions, Defendants and their co-conspirators found a revenue opportunity in unlawfully-coordinated standalone rail fuel surcharges.  As a first step, in 2003, Defendants and their co-conspirators agreed to eliminate fuel as a component in the AII index and reweigh the remaining non-fuel components.

39. Beginning no later than Spring 2003 and through the present, Defendants' top executives met regularly at conferences, restaurants, and recreational events.  For example, these executives met with each other at the biannual National Freight Transportation Association ("NFTA") meetings and at AAR board meetings in Washington D.C.

40. Within just months of a Spring 2003 NFTA meeting in Arizona, and as early as July 2003, BNSF and UP abruptly started to impose identical Inflated Fuel Surcharges on their carload traffic.

41. Before July 2003, UP's fuel surcharge changed monthly based on the WTI index, but UP switched to basing its fuel surcharges off the HDF index beginning in July 2003, the same index used by BNSF.

42. BNSF and UP also began to use the same formula and implemented changes on the same schedule.  They did not impose a surcharge when the average price of U.S. diesel fuel was equal to or less than $1.35 per gallon, but for every five cent increase above $1.35 per gallon, they instituted a 0.5 percent surcharge.  For example, if prices rose by 30 cents, the surcharge would increase by 3 percent.  They announced the updated fuel surcharges at the first day of the month following the change to the HDF index, and then applied the new surcharges one month thereafter.  For instance, if the fuel price changed in February, BNSF and UP would announce their new Inflated Fuel Surcharge percentages on March 1, and then impose those surcharges for shipments in April.

43. The Western Railroads' simultaneous imposition of Inflated Fuel Surcharges using an identical method based on the HDF index reflects that they did so upon agreement with each other, not as independent responses to any common market forces.

13

44. Indeed, UP had modified its existing fuel surcharge program only two months before it decided to implement the identical Inflated Fuel Surcharge formula used by BNSF.  The uncanny timing suggests that UP's unexpected adjustment was the result of concerted, rather than independent, action.

45. However, even though BNSF and UP agreed to charge identical Inflated Fuel Surcharges, they still could not successfully impose them because of the widespread existence of contracts that used the AII and RCAF cost indexes, which already accounted for fuel costs.  Accordingly, all three Defendants and their co-conspirators conspired to remove the fuel component from the AII, thus leaving them free to impose standalone fuel surcharges and earn cartel profits without being accused of double recovery of fuel costs.

46. In the Fall of 2003, BNSF and UP started efforts to get the AAR board to agree to a fuel surcharge program by eliminating the fuel component from the AII index and reweighing the remaining non-fuel components.  In AAR board meetings and discussions in October and December 2003, Defendants and their co-conspirators agreed to eliminate the fuel component from the index and switch to imposing standalone fuel surcharges.

47. As a result of the collusive and concerted actions of Defendants, who dominate the AAR, in December 2003 the AAR created a new All Inclusive Index Less Fuel, which now excluded fuel as a component.  The December 2003 AAR announcement stated: "This issue of AAR Railroad Cost Indexes inaugurates a new index: the All-Inclusive Index Less Fuel. This index is calculated using the same components and methods as the All-Inclusive Index uses for the Rail Cost Adjustment Factor, with the exception of the exclusion of the fuel component."  This was the first time the AAR created a cost adjustment index that did not include fuel as a cost factor.

48. As a result of Defendants' successful conspiracy to have the AAR create the new AIILF, the Western Railroads were now able to successfully impose Inflated Fuel Surcharges in accordance with the agreement they had made in July 2003.

49. As illustrated by the following chart, the Western Railroads' Inflated Fuel Surcharge percentages on carload traffic varied before the conspiracy began, but were identical starting in July 2003:

### MONTHLY SURCHARGE PERCENTAGES -- WESTERN RAILROADS

| MONTH | BNSF | UP |
|---|---|---|
| Jun-02 | 1% | 0 |
| Jul-02 | 1% | 0 |
| Aug-02 | 0 | 0 |
| Sep-02 | - | - |
| Oct-02 | 1% | - |
| Nov-02 | 2% | - |
| Dec-02 | 2.5% | - |
| Jan-03 | 2.0% | 2.0% |
| Feb-03 | 2.0% | 2.0% |
| Mar-03 | 2.5% | 2.0% |
| Apr-03 | 4.5% | 2.0% |
| May-03 | 2.0% | 2.0% |
| Jun-03 | 3.0% | 2.0% |
| Jul-03 | **2.5%** | **2.5%** |
| Aug-03 | 2.0% | 2.0% |
| Sep-03 | 2.0% | 2.0% |
| Oct-03 | 2.5% | 2.5% |
| Nov-03 | 2.5% | 2.5% |
| Dec-03 | 2.5% | 2.5% |
| Jan-04 | 2.5% | 2.5% |
| Feb-04 | 2.5% | 2.5% |
| Mar-04 | 3.5% | 3.5% |
| Apr-04 | 3.5% | 3.5% |
| May-04 | 4.0% | 4.0% |
| Jun-04 | 4.5% | 4.5% |
| Jul-04 | 5.0% | 5.0% |
| Aug-04 | 5.0% | 5.0% |
| Sep-04 | 5.0% | 5.0% |
| Oct-04 | 6.0% | 6.0% |
| Nov-04 | 7.0% | 7.0% |
| Dec-04 | 9.0% | 9.0% |

| MONTH | BNSF | UP |
|--------|--------|--------|
| Jan-05 | 9.0% | 9.0% |
| Feb-05 | 8.0% | 8.0% |
| Mar-05 | 7.5% | 7.5% |
| Apr-05 | 8.0% | 8.0% |
| May-05 | 10.0% | 10.0% |
| Jun-05 | 10.5% | 10.5% |
| Jul-05 | 9.5% | 9.5% |
| Aug-05 | 10.5% | 10.5% |
| Sep-05 | 11.5% | 11.5% |
| Oct-05 | 13.0% | 13.0% |
| Nov-05 | 16.0% | 16.0% |
| Dec-05 | 18.5% | 18.5% |
| Jan-06 | 13.5% | 13.5% |
| Feb-06 | 12.0% | 12.0% |
| Mar-06 | 12.5% | 12.5% |
| Apr-06 | 12.5% | 12.5% |
| May-06 | 13.5% | 13.5% |
| Jun-06 | 15.0% | 15.0% |
| Jul-06 | 16.5% | 16.5% |
| Aug-06 | 16.5% | 16.5% |
| Sep-06 | 17.0% | 17.0% |
| Oct-06 | 18.0% | 18.0% |
| Nov-06 | 15.5% | 15.5% |
| Dec-06 | 13.0% | 13.0% |
| Jan-07 | 13.0% | 13.0% |
| Feb-07 | 14.0% | 14.0% |
| Mar-07 | 12.5% | 12.5% |
| Apr-07 | 12.5% | 12.5% |
| May-07 | 14.5% | 14.5% |
| Jun-07 | 16.0% | 16.0% |
| Jul-07 | 15.50% | 15.50% |
| Aug-07 | 16.00% | 16.00% |
| Sep-07 | 16.50% | 16.50% |
| Oct-07 | 16.50% | 16.50% |
| Nov-07 | 17.50% | 17.50% |
| Dec-07 | 18.50% | 18.50% |
| Jan-08 | 21.50% | 21.50% |
| Feb-08 | 21.00% | 21.00% |
| Mar-08 | 21.00% | 21.00% |
| Apr-08 | 21.50% | 21.50% |
| May-08 | 26.50% | 26.50% |
| Jun-08 | 28.50% | 28.50% |
| Jul-08 | 32.00% | 32.00% |
| Aug-08 | 34.50% | 34.50% |

| MONTH | BNSF | UP |
|-------|------|-----|
| Sep-08 | 35.00% | 35.00% |
| Oct-08 | 31.00% | 31.00% |
| Nov-08 | 28.00% | 28.00% |
| Dec-08 | 23.50% | 23.50% |

50. The new AIILF allowed the Eastern Railroads to also impose new Inflated Fuel Surcharges soon after the index was announced in December 2003, in a manner similar to the Western Railroads, *i.e.*, they too calculated the fuel surcharges by using a price index (albeit the WTI instead of HDF) and charging a percentage for every incremental increase in price over the threshold amount set by the WTI.  Whenever the monthly average WTI price exceeded more than $23 per barrel of crude oil, the Eastern Railroads agreed to apply a fuel surcharge of 0.4 percent for every $1 in excess of $23 per barrel on their carload traffic.  For example, each $3 increase in price per barrel would increase the surcharge by 1.2 percent.  The imposition of Inflated Fuel Surcharges using an identical method based on the WTI index reflects that the Eastern Railroads did so upon agreement with one another, not as independent responses to any common market forces.

51. The Eastern Railroads also agreed to impose any changes two months after the WTI Index had changed.  For example, if the WTI average price exceeded $23 per barrel in January, the Eastern Railroads would assess the applicable fuel surcharge percentage in March.  Like clockwork, each month, the Eastern Railroads would publish their monthly fuel surcharge percentages on their websites, making coordination easier and any deviations obvious.

52. For over four years, the Eastern Railroads implemented new fuel surcharges at the same time when the Western Railroads imposed new fuel surcharges, despite that fuel costs and fuel efficiency varied widely among the Defendants.  Viewing the Eastern Railroads' new fuel surcharge programs in the aggregate, CSX and Defendant NS's sudden shift in imposing fuel

17

surcharges was clearly a direct result of the conspiracy of all three Defendants and their co-conspirators to change the index, not as independent responses to any common market forces.

53. As illustrated by the following chart, the Eastern Railroads' Inflated Fuel Surcharge percentages as applied to the base rate on carload traffic varied before the conspiracy began, but were identical starting in March 2004:

### MONTHLY SURCHARGE PERCENTAGES -- EASTERN RAILROADS

| MONTH | CSX | NS |
|---|---|---|
| Jun-03 | 2.4% | 2.0% |
| Jul-03 | 2.4% | 2.0% |
| Aug-03 | 3.2% | 2.0% |
| Sep-03 | 3.2% | 2.0% |
| Oct-03 | 3.6% | 2.0% |
| Nov-03 | 2.4% | 2.0% |
| Dec-03 | 3.2% | 2.0% |
| Jan-04 | 3.6% | 2.0% |
| Feb-04 | 4.0% | 2.0% |
| **Mar-04** | **4.8%** | **4.8%** |
| Apr-04 | 4.8% | 4.8% |
| May-04 | 5.6% | 5.6% |
| Jun-04 | 5.6% | 5.6% |
| Jul-04 | 7.2% | 7.2% |
| Aug-04 | 6.4% | 6.4% |
| Sep-04 | 7.2% | 7.2% |
| Oct-04 | 8.8% | 8.8% |
| Nov-04 | 9.2% | 9.2% |
| Dec-04 | 12.4% | 12.4% |
| Jan-05 | 10.4% | 10.4% |
| Feb-05 | 8.4% | 8.4% |
| Mar-05 | 9.6% | 9.6% |
| Apr-05 | 10.0% | 10.0% |
| May-05 | 12.8% | 12.8% |
| Jun-05 | 12.4% | 12.4% |
| Jul-05 | 10.8% | 10.8% |
| Aug-05 | 13.6% | 13.6% |
| Sep-05 | 14.4% | 14.4% |
| Oct-05 | 16.8% | 16.8% |
| Nov-05 | 17.2% | 17.2% |
| Dec-05 | 16.0% | 16.0% |
| Jan-06 | 14.4% | 14.4% |
| Feb-06 | 14.8% | 14.8% |

| MONTH | CSX | NS |
|---|---|---|
| Mar-06 | 17.2% | 17.2% |
| Apr-06 | 15.6% | 15.6% |
| May-06 | 16.0% | 16.0% |
| Jun-06 | 18.8% | 18.8% |
| Jul-06 | 19.2% | 19.2% |
| Aug-06 | 19.2% | 19.2% |
| Sep-06 | 20.8% | 20.8% |
| Oct-06 | 20.4% | 20.4% |
| Nov-06 | 16.4% | 16.4% |
| Dec-06 | 14.4% | 14.4% |
| Jan-07 | 14.8% | 14.8% |
| Feb-07 | 16.0% | 16.0% |
| Mar-07 | 12.8% | 12.8% |
| Apr-07 | 14.8% | 14.8% |
| May-07 | 15.2% | 15.2% |
| Jun-07 | 16.4% | 16.4% |
| Jul-07 | 16.4% | 16.4% |
| Aug-07 | 18.0% | 18.0% |
| Sep-07 | 20.8% | 20.8% |
| Oct-07 | 20.0% | 20.0% |
| Nov-07 | 22.8% | 22.8% |
| Dec-07 | 25.2% | 25.2% |
| Jan-08 | 28.8% | 28.8% |
| Feb-08 | 27.6% | 27.6% |
| Mar-08 | 28.0% | 28.0% |
| Apr-08 | 29.2% | 29.2% |
| May-08 | 33.2% | 33.2% |
| Jun-08 | 36.0% | 36.0% |
| Jul-08 | 41.2% | 41.2% |
| Aug-08 | 44.4% | 44.4% |
| Sep-08 | 44.4% | 44.4% |
| Oct-08 | 37.6% | 37.6% |
| Nov-08 | 32.4% | 32.4% |
| Dec-08 | 21.6% | 21.6% |

54. Although the Eastern Railroads eventually switched to a mileage-based fuel surcharge program, upon information and belief, the effects of Defendants' conspiracy on prices continued.

### DEFENDANTS UNIFORMLY APPLIED THE INFLATED FUEL SURCHARGES TO AS MANY CUSTOMERS AS POSSIBLE, INCLUDING DOW, WITH VIRTUALLY NO EXCEPTIONS

55. To ensure the success of the conspiracy, Defendants agreed to impose Inflated Fuel Surcharges on as many customers as possible, applying them to published tariff rates, contract traffic, and exempt traffic not subject to federal rate regulation.  As of January 2004, BNSF pricing guidelines stated that "Every Contract should include a fuel surcharge clause.  All new and all renewing contract negotiations should have a fuel surcharge as the goal."  BNSF meeting notes reflected that there were "[v]irtually no exceptions" to imposing these surcharges.  An NS vice president acknowledged that the railroad's "policy [was] to apply the standard fuel surcharge to as many customers as possible."  Internal UP emails also stated that "all contracts without fuel language will have fuel language upon renewal."  Co-conspirator CSX also required that "any multiyear deals" include the fuel surcharges.

56.  There is no legitimate business justification or natural explanation for Defendants' collective action to cause the AAR to adopt and publish the AIILF or to apply Inflated Fuel Surcharges virtually without exception. The AII and RCAF indexes, used by Defendants for decades, accurately accounted for fuel costs and would have permitted Defendants to fully recover any increases in fuel costs that occurred after the conspiracy began.

57.  Under their new AIILF-based fuel surcharge programs, Defendants increased their fuel surcharges at much higher rates than the actual increase in fuel costs.  For example, from the third quarter of 2003 and the third quarter of 2004, BNSF's fuel costs increased by 14.4%, however its fuel surcharge increased by 25.3% during the same period.  As a result, BNSF shippers paid substantially more than BNSF's actual cost for fuel during this time.  Shippers of unregulated freight from the other Defendants similarly overpaid during this and other periods.

58. Defendants' Inflated Fuel Surcharges also did not account for improvements in fuel efficiency.  BNSF disclosed in 2005 that its fuel efficiency had improved by 9% over the past 10 years.  By 2006, railroads could, on average, move one ton of freight 423 miles on one gallon of diesel fuel.

59. To "kick off" its 2006 ad campaign, NS touted its alleged efficiency in an advertisement published in the Wall Street Journal, stating:

> At Norfolk Southern, we're conscientious at the pump. We've always worked to increase capacity while using less fuel. From improved infrastructure and shorter routes to onboard computers, we've been able to accomplish an efficiency unimaginable just a few years ago.  Today, we can move a ton of freight an average of 410 miles on just one gallon of diesel fuel.  Mileage like this keeps America's economy moving.

60. And in a 2007 publication, the AAR wrote that Defendants' fuel efficiency was "constantly improving."  However, despite Defendants' increased fuel efficiency, their fuel surcharges, calculated by a percentage of the base rate, continued to soar and did not reflect these fuel efficiency gains.

61. Indeed, since the fourth quarter of 2007, the overall fuel consumption by Defendants has decreased 3-5%, yet Defendants continued to collect millions in revenues in connection with fuel surcharges.

62. It thus appears that the driving purpose of Defendants' uniform Inflated Fuel Surcharges was to yield revenue beyond actual fuel cost increases.  Defendants' own executives admitted that the new fuel surcharges were "more aggressive" and "yielded more revenue."  The then-manager of NS pricing systems described them as "a blatant general rate increase."  A CSX public filing also identified the "fuel surcharge program" as a "primary component [ ] of the [company's] revenue gain."  One BNSF employee described the fuel surcharge program as "a

revenue maximization program, not protection against fuel prices."  UP employees conveyed that they saw "nothing wrong with recover [actual fuel costs] at a rate greater than 100%."

63. There is also no plausible explanation that these actions were taken independently by Defendants.  The creation of the new AIILF index was not required by any regulatory body, but instead was the result of Defendants' joint decision to craft and implement a base rate adjustment index without a fuel component which would then allow them to create standalone fuel surcharges that they could collectively impose on customers.  Defendants acted against their own independent economic interests by agreeing to collude on Inflated Fuel Surcharges.  Without collusion, railroads with lower fuel costs would have no need for fuel surcharges and thus increase their market share.  Rather than compete with one another, Defendants adopted an industry-wide pattern of uniform Inflated Fuel Surcharge pricing based on the total price of freight, dramatically increasing their fuel surcharge revenues beyond actual increases in costs and ultimately harming consumers.

64. This sudden shift and convergence in fuel surcharge practices did not escape industry analysts.  For example, one analyst concluded in 2003 that rising fuel costs did not "support[ ]" the imposition of these new fuel surcharges and that she was "puzzled by the fact that the railroads appear to be matching fuel surcharges rather than developing their own pricing initiatives."  ("Following the Competition," *Traffic World*, July 14, 2003).

65. The STB took notice as well.  Beginning in 2006, the STB sought public comments concerning the railroad industry's practice of computing rail Inflated Fuel Surcharges as a percentage of base rate for rate-regulated rail freight transport.

66. Among others, Dow submitted written comments on April 27, 2006, noting that "[t]he railroads [had] chosen not to provide [Dow] with appropriate documentation to help [it]

understand their [Inflated F]uel [S]urcharge methodologies" but based on its analysis of publicly available information, it believed that "the [Inflated F]uel [S]urcharges [were] allowing the railroads to over-recover their incremental fuel cost and [had] become a method of revenue enhancement."  STB Ex Parte No. 661, ID No. 216389 (Apr. 27, 2006).

67. On January 25, 2007, the STB issued an administrative decision, agreeing that the railroads' practice of computing rail Inflated Fuel Surcharges as a percentage of base rate for rate-regulated traffic was an "unreasonable practice" because there was little correlation between the surcharges applied and the actual change in fuel costs.  STB Ex Parte No. 661 (Jan. 25, 2007).  However, the STB expressly stated that its jurisdiction did not reach rail rates and services governed by contracts, even though Defendants applied the same "unreasonable practice" to their contract traffic, and limited its "findings and actions . . . only to regulated common carrier traffic."  *See id.*

**DEFENDANTS' OTHER ACTIONS IN FURTHERANCE OF THE CONSPIRACY**

68. In addition to their agreement to implement and impose Inflated Fuel Surcharges, Defendants took other steps to further their conspiracy.  For one, Defendants switched from offering long-term contracts, the terms of which were never disclosed, to offering contracts that could be re-priced as often as each year, the terms of which were disclosed publicly.

69. Prior to 2003, Defendants entered into long-term contracts ranging from five to ten years with clauses that did not permit rate increases beyond a certain point or that excluded Inflated Fuel Surcharges altogether.  After 2003, the contract terms offered by Defendants were significantly shorter and included Inflated Fuel Surcharges.  By way of example, prior to 2003, Dow's contracts with Defendants often contained multi-year terms and excluded Inflated Fuel

Surcharges.  After those contracts expired in or after 2003, Defendants offered only short-term contracts to Dow that uniformly included Inflated Fuel Surcharges.

70. Dow sought to enter into longer term contracts because longer term contracts allowed them to minimize risks and made shipping costs more predictable.  In a competitive environment, forcing customers to assume greater risks by offering short-term contracts without any offsetting benefit (such as lower prices) would cause customers to seek alternatives, which would promote competition between carriers for their business.  Here, all Defendants raised prices and did not offer any compensation to customers for assuming additional risk, by forcing them into short-term contracts.

71. Similarly, in a competitive market, one would expect that the railroads would seek, as they had in the past, to reduce their own risks and lock-in market share by entering into long-term contracts.  Defendants, however, collectively refused to offer long-term contracts and took no steps to minimize their own risks from fluctuations in demand.  This coordinated behavior was hardly routine market conduct.

72. In furtherance of the conspiracy, Defendants also generally declined to negotiate discounts on the Inflated Fuel Surcharges and base rates, even though Defendants had entertained such negotiations prior to 2003.  Defendants adopted a "take it or leave it" attitude and, as a result, fuel surcharges were more or less accepted as a *fait accompli*.  While Dow was never happy with the Inflated Fuel Surcharges, it was left with little choice but to accept them.

73. In the rare instances where Defendants were willing to negotiate down the Inflated Fuel Surcharges, Defendants merely shifted the intended increase to a different component of the overall freight rate, such that Dow still had to pay the conspiracy-inflated price.

74. Defendants' conspiracy thus succeeded: prices of Inflated Fuel Surcharges charged to Dow and other rail shippers were raised to or maintained at supra-competitive levels after the conspiracy began, netting Defendants billions in revenue.  Defendants' and co-conspirator CSX's market shares also remained stable due to their illicit agreements:

| Railroad Market Share: Originated Tons and Carloads 2003 - 2008[1] | | | | | | |
|---|---|---|---|---|---|---|
| | **2003** | **2004** | **2005** | **2006** | **2007** | **2008** |
| **BNSF** | | | | | | |
| Carloads Originated | 7,662,699 | 8,237,466 | 8,727,121 | 9,335,024 | 9,174,167 | 9,021,851 |
| % of Total Originated Carloads | 28.4% | 29.2% | 30.2% | 31.2% | 31.4% | 31.7% |
| Tons Originated | 460,789,676 | 483,296,128 | 498,121,970 | 539,511,527 | 546,445,840 | 552,297,049 |
| % of Total Originated Tons | 27.8% | 28.3% | 28.7% | 30.1% | 30.8% | 31.1% |
| **CSX** | | | | | | |
| Carloads Originated | 6,470,386 | 6,611,766 | 6,537,293 | 6,607,931 | 6,348,515 | 6,127,125 |
| % of Total Originated Carloads | 24.0% | 23.4% | 22.6% | 22.1% | 21.7% | 21.5% |
| Tons Originated | 391,993,962 | 403,152,732 | 409,486,655 | 414,266,429 | 405,630,002 | 397,947,902 |
| % of Total Originated Tons | 23.7% | 23.6% | 23.6% | 23.1% | 22.8% | 22.4% |
| **NS** | | | | | | |
| Carloads Originated | 5,115,859 | 5,524,545 | 5,800,390 | 5,824,813 | 5,670,400 | 5,617,285 |
| % of Total Originated Carloads | 19.0% | 19.6% | 20.0% | 19.5% | 19.4% | 19.7% |
| Tons Originated | 306,322,113 | 319,014,426 | 325,779,848 | 323,407,280 | 315,583,286 | 316,793,119 |
| % of Total Originated Tons | 18.5% | 18.7% | 18.8% | 18.1% | 17.8% | 17.8% |
| **UP** | | | | | | |
| Carloads Originated | 7,692,160 | 7,831,823 | 7,874,879 | 8,132,004 | 8,045,965 | 7,720,041 |
| % of Total Originated Carloads | 28.6% | 27.8% | 27.2% | 27.2% | 27.5% | 27.1% |
| Tons Originated | 497,373,006 | 503,052,146 | 503,056,340 | 514,357,111 | 508,423,635 | 509,083,147 |
| % of Total Originated Tons | 30.0% | 29.4% | 29.0% | 28.7% | 28.6% | 28.7% |
| Total | | | | | | |
| Carloads Originated | 26,941,104 | 28,205,600 | 28,939,683 | 29,899,772 | 29,239,047 | 28,486,302 |
| Tons Originated | 1,656,478,757 | 1,708,515,432 | 1,736,444,813 | 1,791,542,347 | 1,776,082,763 | 1,776,121,217 |

[1]AAR Railroad Facts and Analysis of Class I Railroads

## THE FAILED CLASS ACTION

75. Other victims of Defendants' wide-reaching conspiracy filed the first of eighteen putative class actions on May 14, 2007, based on similar conduct by Defendants as alleged herein.  The actions were consolidated by the Multi-District Litigation ("MDL") panel on November 14, 2007 before the Honorable Paul L. Friedman in the United States District Court for the District of Columbia (1:07-mc-00489) (the "MDL Action").  The MDL Action proceeded as a putative direct purchaser class action, of which Dow could have been a member.

76. After nearly a decade of proceedings, extensive and protracted discovery, and multiple rounds of briefing on class certification, Judge Friedman denied class certification on October 10, 2017.  *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 292 F. Supp. 3d 14 (D.D.C. 2017). The D.C. Circuit affirmed the denial.  *In re Rail Freight Fuel Surcharge Antitrust Litig.* - MDL No. 1869, No. 18-7010, ---F.3d---, 2019 WL 3850581 (D.C. Cir. Aug. 16, 2019).  Dow's claim was tolled after the denial of class certification.

## DEFENDANTS' INFLATED FUEL SURCHARGE PROFITS

77. The Inflated Fuel Surcharges that Defendants agreed to implement provided for a substantial over-recovery of actual costs, and they essentially functioned as a profit center for participating railroads.  Billions of dollars in revenues that would have otherwise not been collected in the absence of collusion were added to Defendants' profits.

78. For example, UP stated in its 10-K filings that it earned $112 million in commodity revenue from its Inflated Fuel Surcharge program in 2003, then $330 million in 2004 (almost a 200% increase), $963 million in 2005 (another near-200% increase), approximately $1.6 billion in 2006 (66% increase), approximately $1.5 billion in 2007 (noting that "2007 fuel surcharge

revenue is not comparable to prior periods due to implementation of new mileage-based fuel surcharge programs" (emphasis added)), and approximately $2.3 billion in 2008.

79. Similarly, BNSF stated in its 10-K filings that it earned $110 million in Inflated Fuel Surcharge freight revenue in 2003, $357 million in 2004, approximately $1.1 billion in 2005, and approximately $1.7 billion in 2006; it reported seeing an increase of approximately $150 million in Inflated Fuel Surcharges in 2007 and approximately $1.46 million in 2008.  BNSF was also aware of the clear impact of the fuel surcharge program on CSX's and NS's revenues, stating in an internal memorandum that CSX and NS "have a 'profit-center' with their Inflated Fuel Surcharge Programs for the customers that participate." *See In re Rail Freight Fuel Surcharge Antitrust Litig.*, 292 F. Supp. 3d at 104-05.

80. Indeed, in 2006, NS reported that its revenues increased by $1.2 billion in 2005, with approximately one-third of the increase being attributable to "higher [F]uel [S]urcharge amounts," while CSX reported that approximately 50% of its revenue was subject to Inflated Fuel Surcharges in 2005.  The following year, CSX reported that "[t]he primary components of [its] revenue gain" between 2006 and 2007 were continued yield management and its Inflated Fuel Surcharge program, "which drove revenue per unit across all major markets."

81. With the fuel surcharge programs driving a significant portion of Defendants' revenues, Defendants increased their market capitalization from approximately $46 billion to approximately $80 billion between July 1, 2003 and December 31, 2008.  And as reported by the American Chemistry Council and Consumers United for Rail Equity ("CURE"), the difference between Defendants' rail fuel surcharge revenue (as publicly reported or estimated) and Defendants' publicly reported actual fuel costs during the period from 2003 through the First Quarter of 2007 came to over $6 billion.

82. Meanwhile, during this time, Dow suffered from the lack of free, open, and unrestricted competition in the market for unregulated rail freight transportation by paying rates well above competitive levels and which could not be otherwise negotiated.

## CONTINUING EFFECTS OF THE CONSPIRACY

83. Following the STB's 2007 decision, CSX, BNSF and UP all implemented mileage-based fuel surcharge programs, first on regulated traffic and then on unregulated traffic. Notwithstanding the changes to their Inflated Fuel Surcharge programs, this did not mean that Defendants or their co-conspirators had withdrawn from the cartel. To the contrary, the effects of their coordination on rail rates were not undone, and Dow continued to pay inflated rates for rail freight services due to Defendants' past and ongoing coordination of prices.

84. The circumstances encouraging Defendants' coordination of rail freight rates in the first place remained the same, and across some dimensions had even intensified, following Defendants' mid-2007 changes in their Inflated Fuel Surcharge formulas. The ultimate objective of Defendants' conspiracy, to raise total rail freight rates, continued to motivate Defendants' behavior. Upon information and belief, Defendants continued to communicate and collude regarding rail freight services and rates after 2007. Defendants (and their co-conspirators) have all remained members of the AAR, and they have continued to attend conferences and industry gatherings such as meetings for the NFTA, the North American Rail Shippers Association, and the Pacific Northwest Association of Rail Shippers. Such communications and collusive activity have had the continuing effect of restraining trade in the market for rail freight services.

## COUNT I

## (VIOLATION OF SECTIONS 1 AND 3 OF THE SHERMAN ACT AND SECTION 4 OF THE CLAYTON ACT)

85. Dow incorporates by reference the allegations in the above paragraphs as if they were fully set forth herein.

86. Defendants entered into and engaged in a contract, combination or conspiracy in unreasonable restraint of trade in violation of Sections 1 and 3 of the Sherman Act, 15 U.S.C. § 1, 15 U.S.C. § 3, and Section 4 of the Clayton Act, 15 U.S.C. § 15.

87. The contract, combination or conspiracy resulted in an agreement, understanding or concerted action between and among Defendants in furtherance of which Defendants fixed, maintained, and standardized prices for rail freight transportation handled through private contracts and other means exempt from regulation.  Such contract, combination, or conspiracy constitutes a per se violation of the federal antitrust laws and is, in any event, an unreasonable and unlawful restraint of trade.

88. Defendants' contract, combination, agreement, understanding or concerted action occurred within the flow of, and substantially affected, interstate and international commerce. Defendants' unlawful conduct was through mutual understandings or agreements by, between, and among Defendants.

89. The contract, combination or conspiracy has had the following effects:

90. Prices charged to Dow for unregulated rail freight transportation were fixed and/or maintained at supra-competitive levels because Defendants applied the Inflated Fuel Surcharges to the total price for services;

91. Dow has been deprived of the benefits of free, open and unrestricted competition in the market for rail freight services; and competition in establishing the prices paid, customers of, and territories for rail freight services has been unlawfully restrained, suppressed and eliminated.

92. As a proximate result of Defendants' and their co-conspirators' unlawful conduct, Dow has suffered injury in that it has paid inflated prices for unregulated rail freight services since July 1, 2003.

**WHEREFORE,** Plaintiff prays for relief as follows:

(1) That the unlawful contract, combination and conspiracy alleged be adjudged and decreed in violation of Sections 1 and 3 of the Sherman Act;

(2) That Dow recovers compensatory damages, as provided by law, determined to have been sustained to it from Defendants and their co-conspirators, and that judgment be entered against Defendants and in favor of Plaintiff;

(3) That each of the Defendants' respective officers, directors, agents and employees, and all other persons acting on behalf of or in concert with them, be permanently enjoined and restrained from, directly or indirectly, continuing or maintaining the combination, conspiracy, or agreement alleged in this case;

(4) That Plaintiff recovers treble damages, as provided by law;

(5) That Plaintiff recovers its costs of the suit, including attorneys' fees, as provided by law; and

(6) For such further relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(a) of the Federal Rules of Civil Procedure, Plaintiff demands a jury trial as to all issues triable by a jury.

Dated:  November 21, 2019            By: */s/  Ryan J. Walsh*          

Nathan P. Eimer (*pro hac vice*)
Email: neimer@eimerstahl.com
Scott C. Solberg (*pro hac vice*)
Email: ssolberg@eimerstahl.com
Benjamin E. Waldin (admission pending)
Email: bwaldin@eimerstahl.com
EIMER STAHL LLP
224 South Michigan Avenue
Suite 1100
Chicago, IL 60604
Telephone: (312) 660-7600
Fax: (312) 692-1718

Ryan J. Walsh
Email:  rwalsh@eimerstahl.com
EIMER STAHL LLP
10 East Doty Street
Suite 800
Madison, WI 53703
Telephone: (608) 441-5798
Fax: (608) 441-5707

*Attorneys for Plaintiff The Dow Chemical Company.*